QUINN EMANUEL URQUHART & SULLIVAN, LLP
Randa A.F. Osman (Bar No. 150798)
randaosman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Lucas V.M. Bento (*pro hac vice forthcoming*)
Jingtian Chen (*pro hav vice forthcoming*)
lucasbento@quinnemanuel.com
jingtianchen@quinnemanuel.com
51 Madison Avenue, Floor 22
New York, NY 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

*Attorneys for Petitioner*
*Shervin Pishevar*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE APPLICATION OF SHERVIN PISHEVAR FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782,<br><br>*Petitioner.* | **DECLARATION OF LORD MACDONALD OF RIVER GLAVEN KT QC IN SUPPORT OF SHERVIN PISHEVAR'S APPLICATION TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. 1782** |

DECLARATION OF LORD MACDONALD

I, Lord Macdonald of River Glaven Kt QC, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1. I submit this declaration in support of Mr. Shervin Pishevar ("Petitioner")'s *Ex Parte* Application and Petition For An Order to Conduct Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. § 1782 from a private investigator (the "Respondent") (the "1782 Application").

2. Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents, including the proposed subpoenas; and (c) information supplied to me by Petitioner or professionals retained by Petitioner.

## QUALIFICATIONS

3. I was called (admitted) to the Bar of England and Wales in 1978 and since then I have practised in criminal and public law in the English courts, in the Caribbean and in Hong Kong. In 1997, I became a Queen's Counsel (senior barrister). In 2003, I was elected Chairman of the Criminal Bar Association and later that year I was appointed Director of Public Prosecutions ("DPP") for England and Wales. In this capacity I was the United Kingdom's Chief Prosecutor and the director of our national prosecuting authority, the Crown Prosecution Service ("CPS"). As DPP, I was responsible to Parliament for all prosecutions brought within our jurisdiction, and personally responsible for the most serious cases; for the development of criminal justice policy in conjunction with senior government ministers and the Prime Minister; for the performance of the CPS; and for relations with overseas prosecutors and prosecuting agencies. My post was equivalent to the criminal justice role of the United States Attorney General, and indeed during my period in office I met with successive United States Attorneys General and their senior staff to discuss both individual cases and matters of common interest, including sensitive national security issues. I held the post of DPP for five years until 2008.

1

DECLARATION OF LORD MACDONALD

4.     Between 2001 and 2016 I sat as a Recorder (part-time judge) of the Crown Court, latterly at the Central Criminal Court in London.  In this capacity I presided over jury trials in serious crime cases.  Since 2010, I have been a Deputy (part-time) High Court Judge sitting in the Administrative Court of the High Court in London dealing with judicial reviews of the policies and practices of Government and public bodies.  The English High Court is of broadly equal status to the United States Federal bench.

5.     In 2007, I was knighted by the Queen for services to the law, and in 2010 I was appointed to the House of Lords, the Upper Chamber of the United Kingdom Parliament, where I sit as an Independent.  I was a Visiting Professor of Law at the London School of Economics between 2009-2012.  In 2012, I was elected Warden (President) of Wadham College in the University of Oxford, and I have been a member of the Law Faculty of Oxford University since that time.

6.     I consider that I have a very high level of expertise in English criminal law.  I am very used to determining and preferring criminal charges, including in the most serious national security cases, and I am very familiar with the approaches taken by English prosecutors to evidence and to allegations of crime.  I believe I can gauge with a high degree of accuracy their likely response to given combinations of law and fact.

7.     I attach my CV at **Exhibit 1**.

## FACTUAL BACKGROUND

8.     Shervin Pishevar is a venture capital investor, entrepreneur and philanthropist.  He is the co-founder of Sherpa Capital, a leading venture capital firm. He was chosen by the U.S. Government as an "Outstanding American by Choice,"

DECLARATION OF LORD MACDONALD

1  one of the only 100 naturalised Americans to be chosen since the beginning of the
2  award.[1]

3      9.    On 27 May 2017, City of London Police ("CoLP") officers arrested Mr.
4  Pishevar on suspicion of rape.  Mr. Ben Rose of Hickman and Rose Solicitors
5  ("Hickman & Rose") attended upon him at Bishopsgate police station.

6      10.   On 29 July 2017, CoLP decided to take no further action in respect of
7  this offence.

8      11.   On 8 November 2017, Fast Company published an article authored by
9  Marcus Baram ("Fast Company Article"), in which he wrote:

10  > *"... Pishevar was indeed arrested last May on suspicion of rape at the
11  > Ned hotel in London, according to his crisis management expert and a
> copy of a police report seen by Fast Company, though he was never
12  > charged with any crime...*
13  > *A City of London police report on the arrest, providing details about
> what happened that night, has been shared with some reporters, though
14  > its authenticity has not been verified and a court injunction filed by his
> lawyers in the United Kingdom ensured that the incident received little
15  > press attention in the U.K."[2]*

16      12.   The Fast Company Article further elaborated on the contents of the
17  purported "police report" to the detriment of Mr. Pishevar's reputation.[3]

18      13.   On 18 October 2017, Mr. Baram emailed CoLP attaching a copy of what
19  he claimed to be a police report that he had obtained which named the Petitioner and,
20  as subsequently confirmed by CoLP, which contained false information (the "Forged
21  Police Report").

22
23

---

24  [1]  *See* U.S. Citizenship and Immigration Service, *2012 Outstanding American by
25  Choice Recipients,* available at https://www.uscis.gov/archive/archive-
26  citizenship/archived-outstanding-americans-choice/2012-outstanding-american-
choice-recipients.
27  [2]  A true and accurate copy of the article is attached hereto as **Exhibit 2**.
28  [3]  *Id.*

3

14. In an email addressed to him and dated 20 October 2017 with reference to the Forged Police Report, Mr. Baram was informed by City of London Police that it did not use "... *documents such as this and do not believe it to be authentic*."[4] The CoLP further confirmed that the "officer" who purportedly authored the report was not an officer employed by the CoLP. This email pre-dates publication of the article on 8 November 2017, identified in paragraph 11 above.

15. On or around 24 October 2017, CoLP again informed Marcus Baram that the report was a fake.

16. In August 2018, Mr. Pishevar asked Mr. Rose of Hickman & Rose to investigate those responsible for the creation and distribution of the Forged Police Report in order that he could consider remedies available to him.

17. On 1 November 2018, Hickman & Rose made a subject access request of CoLP (on behalf of Mr. Pishevar) pursuant to his rights under the Data Protection Act 2018. The responsive material was received by Hickman & Rose in May 2019 but did not include the Forged Police Report.

18. On 4 April 2019, Hickman & Rose sought a High Court order requiring CoLP to disclose a copy of the Forged Police Report and to explain its provenance, pursuant to the court's power to exercise its discretion in accordance with the decision in *Norwich Pharmacal v Commissioners of Customs and Excise* [1974] UKHL 6 (similar to a Section 1782 action).[5] On 29 May 2019, the Court sealed an order, requiring CoLP to so comply (the "NPO Order").

19. In compliance with the NPO Order, Teresa la Thangue, Communications Director for CoLP signed a statement about her dealings with the press in relation to the investigation into the Petitioner on 23 May 2019. She wrote:

> *"2. On the 18 October 2017, Corporate Communications received an email from Marcus Baram, a journalist, stating that he had obtained the 'arrest report' in relation to matter that he had previously enquired*

---

[4] A true and accurate copy of the email is attached hereto as **Exhibit 3.**

[5] A true and accurate copy of the decision is attached hereto as **Exhibit 4**.

DECLARATION OF LORD MACDONALD

about; a report of rape at the Ned Hotel on the 27 May 2017.1 now produce marked "TLT/I" a copy of the said email.

3.      In his email of the 18 October 2017, Marcus Baram asked us to verify that the document attached to his email was authentic.  The attached document was a screenshot of what appeared to be an arrest report.  I now produce marked "TLT/2" a copy of the attachment

4.      The 'arrest report' was sent to the City of London Police's Professional Standards Directorate who were able to confirm that the document was not a City of London Police document.

5.      Thereafter, Marcus Baram was told, along with any other journalists who enquired, **that it was a fake**, explaining that it was not a document that is used by the City of London Police, and that the officer named does not work and has not worked for the City of London Police."[6]

20.      Whilst this information was helpful, it failed to assist the Petitioner in identifying the author(s) or distributor(s) of the Forged Police Report.  The Petitioner believes this information is likely to be held by the author of the Fast Company Article who was given the Forged Police Report by an individual based in Washington D.C. ("D.C. Source").

21.      On 6 August 2019, the Petitioner petitioned the U.S. District Court for the Southern District of New York ("SDNY") for an order authorizing Petitioner to conduct discovery from Fast Company and Mansueto Ventures LLC relating to the Fast Company Article ("First Section 1782  Application").  On 9 August 2019, the Magistrate Judge Stewart D. Aaron granted the First Section 1782 Application.  The Petitioner subsequently served subpoenas on Fast Company and Mansueto.  Between 17 September 2019 and 21 October 2019, Fast Company/Mansueto produced certain information about the Forged Police Report ("Disclosed Material").

22.      On consideration of the Disclosed Material, I understand that the Petitioner's U.S. lawyers have established as follows:

---

[6]   A true and accurate copy of the email is attached hereto as **Exhibit 5** (emphasis added).

DECLARATION OF LORD MACDONALD

a.    Marcus Baram obtained the Forged Police Report from the D.C. Source who messaged him using a mobile application called "Signal";[7]

b.    When Mr. Baram met the D.C. Source at a café in Washington DC in September 2017, a copy of the file containing the Forged Police Report was transferred to Mr. Baram's laptop using a USB pen drive;[8]

c.    Mr. Baram was informed by the D.C. Source that he obtained the report from a source in the UK, whom he identified as "a male lawyer based in the UK[9]" ("UK Source").[10]

d.    The Petitioner's lawyers have now also established that the UK Source also falsely alleged to D.C. Source the following false information ("Other False Information"):

    i.    the Petitioner paid the complainant in the rape allegation the sum of £300,000;[11]

    ii.    the allegation was being handled by City of London Police "Gold Command" for assessments of forensic evidence and other supporting evidence;[12] and

---

[7]   *See* **Exhibit 6**.

[8]   *See* **Exhibit 7**.

[9]   Subject to confirmation as to his professional status and in addition to any criminal liability, the lawyer may also be in breach of his professional obligations and subject to disciplinary sanction from his regulator.

[10]   *See* **Exhibit 8**.

[11]   *See* **Exhibit 9**.

[12]   *Id.*

6

DECLARATION OF LORD MACDONALD

iii.   police at Bishopsgate police station were "outraged" over the situation and were demanding a review of police procedures in the case.[13]

23.    It is my understanding that, while the Petitioner subsequently initiated a Section 1782 proceeding against Mr. Baram to obtain the name of the D.C. Source, Mr. Baram refused to provide the name of the D.C. Source despite a court order compelling him to do so.  I understand that this order is currently subject to objections from Mr. Baram and that a hearing on those objections was adjourned pending investigation into Mr. Anson's (the Respondent) information regarding the D.C. Source, which is the basis of the present 1782 Application.

## THE CONTEMPLATED ENGLISH PROCEEDINGS

24.    Hickman & Rose retained me to advise on whether the author of the Forged Police Report and anyone else with the requisite intent who were involved in maliciously distributing the Forged Police Report have committed an offence as a matter of English criminal law.  It is my understanding that Hickman & Rose, as counsel to Mr. Pishevar, is planning to initiate a criminal action against the author of the Forged Police Report and anyone else with the requisite intent (including the UK Source) in line with the offences I identify below.  To this end, I understand that Hickman & Rose has commenced drafting summonses to initiate criminal proceedings against these individuals, as creators and knowing purveyors of both the Forged Police Report and false allegations.

25.    I say at the outset that I have no doubt that an English prosecutor would consider the faking of an internal police report to be an especially egregious act, particularly in circumstances where the purpose was to deploy that Forged Police Report in public in order to cause serious damage to its purported subject.  Such reckless criminal behaviour is likely to strike at and undermine public confidence in

---

[13]   *Id.*

7

the institutions and processes of law enforcement and I consider that an English prosecutor in possession of sufficient evidence to bring a charge would wish not only to deploy a robust prosecutorial response, but one capable of achieving, in the event of conviction, a condign sentence commensurate with the reprehensible nature of the conduct.

26.    With that background in mind, my considered view is that the author of the Forged Police Report and any knowing purveyors of the Forged Police Report and Other False Information (including the UK Source) have committed a number of criminal offences under English law.  I shall deal with them in turn.[14]

## CRIMINAL LIABILITY OF AUTHOR OF FORGED POLICE REPORT AND OTHER KNOWING PURVEYORS

### *Sections 1-4 of the Forgery and Counterfeiting Act 1981*[15]

27.    Under Sections 1-4 of the Forgery and Counterfeiting Act 1981, it is an offence to make a false instrument, to copy a false instrument, to use a false instrument, or to use a copy of a false instrument, so long as the intention behind the relevant act was to induce somebody to accept the instrument as genuine, and as a result to do or not to do something to their or some other person's prejudice.  Under Section 8, a false instrument is defined as any document, whether of a formal or informal character.

28.    In my judgement, whoever created, copied or used the Forged Police Report or a copy of the Forged Police Report, including the UK Source, with the requisite intent is guilty of one or other of these English offences.  This is because the Forged Police Report is plainly a false instrument under English law, and the creator, and any complicit copiers and users of the Forged Police Report, or copy thereof,

---

[14]    For the avoidance of doubt, the Respondent here will not be a party to any of Petitioner's contemplated proceedings.

[15]    A true and correct copy of Sections 1-4 and Section 8 of the Forgery and Counterfeiting Act 1981 is attached hereto as **Exhibit 10**

DECLARATION OF LORD MACDONALD

including the UK Source, who intended by their acts to harm Mr. Pishevar have, prima facie, met the conditions of the statute.  It is an inescapable inference on the facts that each intended, *inter alia*, that some other person or persons should accept the Forged Police Report as genuine and that this would result in some prejudice to Mr. Pishevar. Each has committed the English offence of forgery, and I would expect an English prosecutor so to conclude.

### *Section 2 of the Fraud Act 2006[16]*

29.    Under Section 2 of the Fraud Act 2006, it is an offence dishonestly to make a false representation, intending by that representation to make a gain for yourself, or to cause a loss to another.  A representation is false if it is untrue or misleading and the person making it knows that it is, or might be, untrue or misleading.  A 'representation' means any representation as to fact or law, express or implied.  A representation is regarded as made if, inter alia, it is submitted in any form to any system or device designed to receive, convey or respond to communications, with or without human intervention.

30.    In my judgement, any person who created the Forged Police Report (including, if they created it, the UK Source) is guilty of the offence of fraud by misrepresentation under English law.  This is because the report was obviously intended by its creator to be perceived by its readers as a genuine police report, and the implied assertion that it was genuine amounted to a false representation; the creator knew this was a false representation; and their plain and inescapable intention in making this false representation was to cause loss to Mr. Pishevar.  Each of the required elements of the offence is made out.  Similar reasoning applies equally to anyone further down the chain, including the UK Source, who passed the Forged Police Report on, knowing it was a fake, and intending thereby to cause loss to Mr.

---

[16]    A true and correct copy of Section 2 of the Fraud Act 2006 is attached hereto as **Exhibit 11**.

DECLARATION OF LORD MACDONALD

Pishevar. Each in these circumstances has committed the English offence of fraud by misrepresentation, and I would expect an English prosecutor so to conclude.

*Sections 6-7 of the Fraud Act 2006*[17]

31.    Under Sections 6-7 of the Fraud Act 2006, it is an offence to make, to supply or to possess any article knowing it is for use in connection with or in the course of fraud. Articles can include any data held in electronic form. It is clear from what I have said in paragraphs 28-29 above that anyone complicit in the deliberate creation and dissemination of the Forged Police Report was acting in connection with or in the course of fraud and that the Forged Police Report was therefore, inescapably, an article for use in that fraud. Indeed, it was the very means by which the fraud would be put into effect. In my judgment, anyone, including the UK Source, complicit in the making, supply or possession of the Forged Police Report, possessed of the requisite intent, is guilty of the English offences of making, supplying or possession of an article for use in fraud, and I would expect an English prosecutor so to conclude.

*The Malicious Communications Act 1988*[18]

32.    Under Section 1 of the Malicious Communications Act 1988, any person who sends to another person an article of any description which conveys information which is false, knowing or believing it to be false, is guilty of an offence, so long as one of their purposes was to cause distress or anxiety to the recipient or to any other person to whom the sender intends its contents or nature should be communicated.

33.    In my judgement, when the creator of the Forged Police Report conveyed it, he or she did so knowing it contained false information (because that information had been invented), and was fully aware that it would inevitably be drawn to Mr.

---

[17]   A true and correct copy of Sections 6-8 of the Fraud Act 2006 is attached hereto as **Exhibit 12**.

[18]   A true and correct copy of Section 1 of the Malicious Communications Act 1988 is attached hereto as **Exhibit 13**.

DECLARATION OF LORD MACDONALD

1  Pishevar's attention (thus establishing the necessary intention under English law),
2  with the equally inevitable result that Mr. Pishevar would be caused distress and
3  anxiety.  Each of the required elements of the offence is made out.  Again, similar
4  reasoning applies to anyone further down the chain, including the UK Source, who
5  passed the Forged Police Report on, knowing or believing it was a fake and contained
6  false information, in the knowledge that it would inevitably come to Mr. Pishevar's
7  attention thereby causing him anxiety and distress.  Each has committed the English
8  offence of sending a malicious communication and I would expect an English
9  prosecutor so to conclude.

10  ### *Criminal Charges under the English Criminal Justice System*

11      34.    The process of conferring a charge under the English criminal justice
12  system is governed by the Code for Crown Prosecutors (the "Code"), a document
13  issued by the Director of Public Prosecutions under the auspices of the Prosecution of
14  Offences Act 1985.  The Code mandates a statutory two stage test before a prosecutor
15  can authorise a criminal charge.  First, the prosecutor must consider whether, on the
16  evidence, there exists a realistic prospect of conviction.  This simply means that in the
17  prosecutor's judgement a court is more likely than not to convict on the evidence then
18  in place.  If the prosecutor considers this is not the case, the matter can go no further.
19  But if this test is passed, the prosecutor goes on to consider the second question:
20  would a prosecution in the case under consideration be in the public interest?

21      35.    I have no doubt that an English prosecutor would consider it to be very
22  strongly in the public interest to prosecute anyone who concocted a fake law
23  enforcement document for deployment in a dispute, for the obvious reason that a
24  prosecution in these circumstances would be essential to maintain public confidence
25  in the processes and procedures of law enforcement.  This means that the real question
26  in this case is the extent to which sufficient evidence can be obtained to provide a
27  realistic prospect of conviction.  In my judgement, taken from many years of
28  prosecution experience at the very highest levels, were it to be possible to obtain

compelling evidence identifying the creator of the Forged Police Report, and/or compelling evidence identifying other knowing purveyors of this false information possessed of the necessary intent, English prosecutors would conclude that there was a realistic prospect of convicting those individuals and they would be swift to authorise charges.  I can conceive of no legal, practical or public policy impediment to such a course.

### *Private Prosecutions in England and Wales*

36.    In addition to conventional State prosecutions, Section 6(1) of the Prosecution of Offences Act 1985[19] preserves the long standing right for private citizens in England and Wales to bring what are called private prosecutions.  This means that instead of making a complaint of crime to police and invoking the procedures of a State prosecution, a private citizen may seek to commence a prosecution without any police or CPS intervention.  In such a case, where evidence exists that appears to provide a realistic prospect of conviction, a private individual may engage lawyers to attend court to obtain a summons against a named defendant. Once a summons has been obtained, the case proceeds in the normal manner, according the conventional legal tests and procedures applied in a State prosecution, save that it is not brought by the police or the CPS but by a lawyer acting on behalf of the private citizen prosecutor.  It is not a requirement that a private citizen prosecutor should be a citizen of the United Kingdom.

37.    I have no doubt that were evidence to be forthcoming to identify the creator of the Forged Police Report, and/or purveyors of the Forged Police Report possessed of the necessary intent, an English court would grant summonses for a private prosecution against those individuals, for all the reasons I have set out above.

---

[19]    A true and correct copy of Sections 6(1)-(2) of the Prosecution of Offences Act 1985 is attached hereto as **Exhibit 14**.

DECLARATION OF LORD MACDONALD

38.     Under Section 6(2) of the Prosecution of Offences Act 1985, the DPP has the power to take over a private prosecution and to convert it into a State prosecution.  In these circumstances, it is open to the DPP either to pursue the case or to abandon it.  Were summonses to be issued in this case and a private prosecution to be commenced, I can conceive of no reason why the DPP would move to take over the case for the purpose of closing it down.  Such a step would normally only be taken if the DPP strongly felt that the prosecution was hopelessly misconceived in fact or law, or if there was some strong public interest reason why the case should not go forward.  I am very confident that none of these factors would apply to a private prosecution in this case.  The evidence I have identified would be very strongly probative of guilt and the prosecution would be strongly in the public interest.  I think it highly likely in these circumstances that either a State or a private prosecution, based on such evidence, would proceed to conviction and sentence.

## THE DISCOVERY SOUGHT BY THE 1782 APPLICATION

39.     I consider that the discovery sought from Mr. Anson is likely to be critical to the English criminal proceedings, since it is likely that it will identify or help to identify the author and/or any distributors of the Forged Police Report, including the UK Source.  As I have explained above, no criminal proceedings may be brought in the United Kingdom without this information, since in its absence there is simply no one to charge.  This means that if Mr. Pishevar and by consequence the English courts cannot obtain access to this material, justice may not be done.  However, with the benefit of this information, and assuming it is adequately probative, there is no legal, evidential or policy impediment in place and charges are highly likely to be preferred.  It is precisely because it is, on the facts of this case, close to axiomatic that the creator of the Forged Police Report and malicious purveyors of the material, including the UK Source are guilty of the offences I have outlined, that discovering their identity is so important, and the 1782 Application so pivotal.  Since the D.C. Source received the Forged Police Report and Other False

DECLARATION OF LORD MACDONALD

Information from the UK Source, the identity of the D.C. Source is of the most critical importance to identifying the UK Source and/or the creators of the Forged Police Report.   Bluntly, English prosecutors would appear to have no other means of obtaining this information essential to the preferment of charges in a case where the public interest very strongly mandates criminal process.

40.   Accordingly, Mr. Pishevar needs the information requested pursuant to the 1782 Application to plead and prove the criminal claims I outlined above.

## ENGLISH COURTS ACCEPT EVIDENCE OBTAINED THROUGH SECTION 1782

41.   I am not aware of any reason that the courts of England and Wales will not be receptive to the judicial assistance requested in the 1782 Application.

42.   The courts in England have declared their willingness to accept evidence obtained through Section 1782 applications.  In *South Carolina Co v Assurantie N V*., a true and correct copy of which is attached as **Exhibit 15,** the House of Lords rejected a finding by the Court of Appeal that the use of information obtained from a 1782 application was inherently objectionable and abusive because it interfered with the court's control of its own procedure.  The House of Lords held that it did not consider that a party to English proceedings,

> "*by seeking to exercise a right potentially available to them under the Federal law of the United States [i.e., seeking discovery through a 1782 application], have in any way departed from, or interfered with, the procedure of the English court.*"[20]

> "*All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe they need in order to prepared and present their case.*"[21]

43.   A similar decision was reached in *Nokia Corporation v. Interdigital Technology Corp.* a true and correct copy of which is attached at **Exhibit 16**.  There

---

[20]   *South Carolina Co v Assurantie N V*. [1987] A.C. 24 (HL) at 42.

[21]   *Id.*

DECLARATION OF LORD MACDONALD

the Court denied a request to restrain a party from making a 1782 Application in the United States and stated that,

> *"it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings."[22]*

44.     The Court further stated that,

> *"the English court should not seek to circumscribe the discretion possessed by the [US] district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment."[23]*

45.     In any event, the material here is sought in order to assist police and prosecutors assemble a criminal case against particular suspects. Police and prosecutors receive evidence and potential evidence in a wide variety of forms, often using such material to assist in the hunt for other related evidence. Of course, before material is deployed in court, it must be placed in admissible form, but that is a secondary issue at this stage. I have no doubt that evidence tending to identify the creators of the Forged Police Report, and any evidence tending to identify later purveyors of the Forged Police Report, including the identity of the UK Source, would prima facie be received by English courts as relevant, the only question being as to whether the evidence was in a form so as to be admissible. This latter question is one for prosecutors to consider at the case building stage, and they are very accustomed to taking the necessary steps to convert relevant material into admissible form so that it may be received in evidence in criminal proceedings. I foresee no special difficulties arising in this case.

---

[22]  *Nokia Corporation v. Interdigital Technology Corp.* [2004] EWHC 2920 at 8.

[23]  *Id.*

DECLARATION OF LORD MACDONALD

1    46.    Further, in the circumstances of this case, where the malicious passing

2  of the relevant material in itself amounts to a criminal offence, the identity of the UK

3  Source will not, under English law, be protected under any privilege.

4    47.    Accordingly, the 1782 Application does not seek to circumvent foreign

5  proof-gathering restrictions or other practice of the Courts of England and Wales, and

6  I believe that there is no basis under English law to assert otherwise.

7    48.    I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746

8  under the laws of the United States that the foregoing is true and correct.

9  Executed on this 16th day of February, 2021 in London, England.

_____

Lord Macdonald of River Glaven Kt QC

DECLARATION OF LORD MACDONALD